482 S.E.2d 641

**STATE of West Virginia, Plaintiff Below, Appellee,**

v.

**Michael D. HICKS, Defendant Below, Appellant.**

No. 23257.

Supreme Court of Appeals of West Virginia.

Submitted Sept. 24, 1996.

Decided Dec. 9, 1996.

William C. Forbes, Prosecuting Attorney, Mary Beth Kershner, Assistant Prosecuting Attorney, Charleston, for Appellee.

John H. Boothroyd, Assistant Public Defender, Public Defender Office, Charleston, for Appellant.

PER CURIAM:

This is an appeal [1] by Michael D. Hicks from an order of the Circuit Court of Kana-

---

**1.** The Honorable Arthur M. Recht resigned as Justice of the West Virginia Supreme Court of Appeals effective October 15, 1996. The Honorable Gaston Caperton, Governor of the State of West Virginia, appointed him Judge of the First Judicial Circuit on that same date. Pursuant to an administrative order entered by this Court on October 15, 1996, Judge Recht was assigned to sit as a member of the West Virginia Supreme Court of Appeals commencing October 15, 1996, and continuing until further order of this Court.

wha County sentencing him to life in the State penitentiary without a recommendation of mercy for first-degree murder with the use of a firearm. On appeal, he claims that the trial judge erred when she, as well as the court clerk, discussed certain matters *ex parte*, out of his presence, with members of the jury. He also claims that the court erred in admitting certain hearsay statements into evidence and in allowing the State to argue that he would not have it that bad in the penitentiary because of amenities provided to inmates. He argues that the testimony of the only two eyewitnesses to the crime charged was so contradictory on key points that the evidence was insufficient to support the conviction of murder in the first degree. Lastly, he claims that the trial court erred by summarily denying his request for return of money confiscated from him upon his arrest.

After reviewing the issues raised and the evidence presented, this Court believes that the trial court erred in allowing or participating in *ex parte* discussions with the jury out of the defendant's presence, and this Court reverses on that ground. The Court also believes that certain of the other rulings by the trial court were erroneous.

On September 11, 1994, a male body was found along the Coal River in St. Albans, West Virginia. An autopsy showed that the victim had been shot in the back of the head and had been strangled. The victim was subsequently identified as being Terrence Spencer, a drug dealer from Detroit, Michigan. He had last been seen alive with a female named Terri on September 9, 1994.

Following the discovery of the body, the investigating officers received two phone calls. In one, an individual named Otilia Lynch stated that information from an unidentified source indicated to her that bloody clothing and bloody articles relating to the crime were located in a dumpster in the area of New Amandaville Court in Kanawha County. In another call, an anonymous person stated, "[t]he person you are looking for in the murder is Michael D. and his girlfriend Terri."

In investigating the case, the police learned that one Christine Claytor, who would not identify her informant, had re-ceived a phone call about clothing being in a dumpster. Additionally, one of the investigating officers, Detective West, was told by a "guy on the street" that "[t]he Terri you are probably looking for is Glen Cain's niece. Glen Cain lives in the trailer up here at 31A Alice Street, and that's where we think these guys were shooting the gun at."

At a dumpster in or near New Amandaville Court, the police found bloody bedspreads, towels, and clothes. They subsequently learned that these articles came from the trailer where Terri Bannister lived and where the defendant had stayed on and off. They then arrested Terri Bannister and the defendant. After being arrested, Terri Bannister gave a statement indicating that the defendant had killed Terrence Spencer and that she had helped the defendant clean up and dispose of the body. Terri Bannister also suggested that one Carli Campbell could support her version of the events. Terri Bannister later agreed to testify against the defendant in exchange for the State allowing her to plead guilty to a misdemeanor and the State's dropping several traffic violation charges against her.

The defendant was tried in May, 1995, and during the trial Terri Bannister testified that the defendant, Michael Hicks, had lived with her on and off for at least a year before September, 1994. As background to her testimony regarding the murder, she testified that on the morning of September 9, 1994, she had given Terrence Spencer, the victim, with whom she was acquainted, $30.00 for cocaine. When he had failed to produce cocaine, she became very angry and upset with him, and a short time thereafter she complained to her friend, Carli Campbell, that she had been "beat for money." The defendant, Michael Hicks, happened by and overheard a part of what was being said, and wanted to know what was wrong. Ms. Bannister explained what had happened. Sometime later, Ms. Bannister and Carli Campbell located Terrence Spencer and persuaded him to go to Ms. Bannister's house. There, Terrence Spencer sat down at a table. While they were there, the defendant, Michael Hicks, approached Terrence Spencer from behind and shot him in the back of the head.

As described by Terri Bannister, "[the defendant] came out of the bathroom, and he shot Terrence in the back of the head." Terri Bannister and Carli Campbell both jumped up at that point and, according to Ms. Bannister, the defendant began strangling Terrence Spencer with a belt. The belt broke, and the defendant asked Terri Bannister to get another belt. Later, the defendant placed a garbage bag over Terrence Spencer's head, apparently to suffocate him, because he was still alive and shaking. When Terri Bannister had produced another belt, the defendant proceeded to strangle Terrence Spencer further until he stopped shaking and stopped breathing.

The testimony further suggests that after Terrence Spencer died, the parties used sheets and towels to wipe blood up off the floor. The defendant also wrapped the body up, placed it over his shoulder, and hid it in some bushes at the side of the house. He then mowed the lawn until Ms. Bannister arranged to borrow a car from a friend named Kelly Dorcas. At that time, the defendant and Ms. Bannister took the body to the Coal River site where it was later found. They dumped the bloody clothes and the towels and sheets that had been used to clean up the mess in the dumpster at New Amandaville Court, where they were later found.

The State also called as a witness Carli Campbell, who verified that she was in the room at the time of the shooting. She also verified that the defendant shot Terrence Spencer. Her testimony as to the exact details of what subsequently happened differed in some details from that of Terri Bannister.

In addition to adducing the testimony of Terri Bannister and Carli Campbell, the State introduced testimony relating to phone calls and reports which the police received in the course of the investigation. In bringing this evidence forth, the State took the position that it was not being introduced for the purpose of showing the truth of the matters asserted, but for the purpose of demonstrating why the State's investigation focused on the defendant and on Terri Bannister.

In the course of the trial, it appears that spectators in the courtroom made remarks, overheard by members of the jury, relating to the legal effect of the phone calls and/or reports. This came to the attention of the trial judge, who promptly stated to the prosecuting attorney and defense counsel at a time when the defendant was apparently present:

THE COURT: I think we may need to put something on the record about the juror. I need to put something on the record. Any time I get a contact from the jury, I want to let you all know this, and we'll take precautions to make sure that it doesn't happen.

I understand that a couple of—we're not exactly sure who—a couple of the folks, the spectators, who were in the courtroom were making some comments in the presence of two—perhaps four—of the jurors about circumstantial evidence being of— and I'm paraphrasing—being of little value as well as the fact that anybody could call the police, that really didn't mean anything, saying this deliberately so that the jurors would hear.

I'm going to ask Mr. Warner and Mr. Jones [the attorneys in the case] to instruct all people who are spectators basically here—not at your request, but certainly spectators—to ensure that they do not say anything in the presence of the jurors.

I will speak to the two jurors in the morning who have reported this to the clerk and find out if it in any way influences what—their decision or influences the case in any way. We want to make sure, too, that no one goes out until the jury has gone to the snack bar or to lunch or left for the day. So Larry, if you'll help me make sure that nobody leaves the courtroom until the jurors have made it to the elevator. Okay.

MR. WARNER [attorney for the defendant]: Your Honor, just to clarify, did the jurors come forward with this information?

THE COURT: Yes.

MR. WARNER: Or did someone overhear it?

THE COURT: No, the jurors came forward.

Counsel for the defendant did not then object to what was transpiring.

Although the judge indicated that she would speak to the jury the next morning, it appears that she did not do so. Instead, at a time which is unclear from the record, she, apparently without the knowledge of the attorneys or the defendant, sent the court's clerk to speak to the jury. This the clerk apparently did, out of the presence of the defendant, the attorneys, and the court, for on a later day the matter was raised again, again apparently in the presence of the defendant and the attorneys:

MR. JONES [prosecutor]: Your Honor, the matter that you had discussed with us, I think, on Monday about jurors overhearing some information, did you happen to talk to those jurors?

THE COURT: Yes, Jennifer [the clerk] did. Jennifer, you spoke with Mr. Douglas [a juror]?

THE CLERK: Uh-huh.

THE COURT: I thought I reported that.

MR. WARNER: We discussed it.

MR. JONES: Yeah, but you were going to talk to them individually.

THE COURT: Oh, no, I didn't talk to them individually. Jennifer talked to Mr. Douglas.

MR. JONES: Is the Court going to inquire?

THE COURT: Let me see counsel at the bench and Mr. Hicks.

\* \* \* \* \* \*

THE COURT: What else did you want to say?

MR. JONES [prosecutor]: Judge, I'd just like to have some more information about what the jurors were told, if it had any impact on—has any influence been on this case about the statements that were made or overheard by them. I'd like to know who they are, who they identify as those people who were talking out loud in their presence.

Because the State didn't have anybody, as I'm aware of, sitting on our side of the—any witnesses from the State that day here. I would like to have them identify who was making those statements.

THE COURT: It was Mr. Douglas, as far as I know. Was there anyone else?

THE CLERK: I think there was a total of four. Two heard them but realized, "We shouldn't be listening to what they are saying" and totally blocked them out. The other two that were there didn't even have a clue, didn't even register, from what I was told.

THE COURT: I'm going to wait until the end of the day. I'm pondering another idea as well, so we'll wait until the end of the day to talk—

MR. WARNER [defense attorney]: Just for the record, I personally told one person to watch for that, don't let that happen. I know that Andrea [Andrea McCauley, defense attorney] as well talked to people—

MS. McCAULEY [defense attorney]: I spoke to the defendant's family that they not do anything inappropriate or they would be ejected from the courtroom. I think they were very clear on that. I explained to them not to speak in front of anyone, not witnesses or jurors. I think that they were clear on that. I made myself quite clear.

The record does not show that the defendant or defense counsel objected during this sequence of events.

Among the assignments of error in this case is the claim that the trial court erred when its court clerk discussed *ex parte* with jurors about overheard spectator comments that the anonymous calls to the police could not be trusted. The defendant claims that this error was prejudicial and that because of it he should be granted a new trial. We agree.

In syllabus point 6 of *State v. Boyd*, 160 W.Va. 234, 233 S.E.2d 710 (1977), this Court stated, "[t]he defendant has a right under Article III, Section 14 of the West Virginia Constitution to be present at all critical stages in the criminal proceeding...." *See*

*also State ex rel. Redman v. Hedrick,* 185 W.Va. 709, 408 S.E.2d 659 (1991).

As explained in *State ex rel. Redman v. Hedrick,* this rule has foundation not only in the West Virginia Constitution, but also in W.Va.Code § 62–3–2, which provides that "[a] person indicted for felony shall be personally present during the trial therefor", and in Rule 43 of the West Virginia Rules of Criminal Procedure, which provides, among other things, that:

> (a) *Presence required.*—The defendant shall be present at the arraignment, at the time of the plea, at every stage of the trial including the impaneling of the jury and the return of the verdict, and at the imposition of sentence, except as otherwise provided by this rule.

The right to be present is not a right to be present at every possible moment, but, as indicated in *State v. Boyd, supra,* is a right to be present at a "critical stage" in the criminal proceeding. In syllabus point 2 of *State v. Tiller,* 168 W.Va. 522, 285 S.E.2d 371 (1981), the Court defined a "critical stage" as follows: "A critical stage of a criminal proceeding is where the defendant's right to a fair trial will be affected." *See also State v. Conley,* 168 W.Va. 694, 285 S.E.2d 454 (1981), and *State v. Boyd, supra.*

Although this Court has not specifically ruled that communication by the judge or another court officer with the jury is a critical stage for the purpose of the defendant's presence, in *State v. Barker,* 176 W.Va. 553, 346 S.E.2d 344 (1986), the Court ruled that the conduct of a trial judge in communicating with the jury in the absence of the defendant and his counsel was improper. Somewhat similarly, in *State v. Smith,* 156 W.Va. 385, 193 S.E.2d 550 (1972), the Court suggested that contact was improper in a similar situation.

Federal courts which follow Rule 43 of the Federal Rules of Criminal Procedure, the federal rule upon which West Virginia's Rule 43 relating to the presence of the defendant is based, have, in a good many cases, addressed whether contact with the jury by a trial judge or another court officer outside the defendant's presence is appropriate. In the early case of *Shields v. United States,* 273 U.S. 583, 47 S.Ct. 478, 71 L.Ed. 787 (1927), both the defendant and the government had joined in a request that the jury be held in deliberation until a verdict was reached. Later during the deliberations, the jury sent a note to the judge informing him of their inability to reach a verdict with regard to certain defendants. The judge sent back a note telling the jury that they would have to find whether these defendants were guilty or not guilty. These notes were sent in the absence of defendant Shields and his counsel, who were not informed about the notes, although the notes were preserved and made a part of the record. The United States Supreme Court, addressing the propriety of the action, noted that the communication with the jurors in the absence of the defendant was improper and constituted reversible error. The Court indicated that the fact that the request had been made jointly by counsel for the defendant and for the government did not justify an exception to the rule entitling the defendant, especially in a criminal case, to be present from the time the jury was impaneled until its discharge after it rendered the verdict. In 1975, in *Rogers v. United States,* 422 U.S. 35, 95 S.Ct. 2091, 45 L.Ed.2d 1 (1975), the Court indicated that a juror's message should have been answered in open court and that the defendant's attorney should have been given an opportunity to be heard before the trial judge responded to the message.

C.A. Wright, Federal Practice and Procedure: Criminal 2d § 724 (1982), recognizes these Supreme Court cases, but goes on to state:

> Despite the clear rule against such private communications between court and jury, they continue to exist. The vital question is under what circumstances they require that a conviction be set aside.

> One state [Pennsylvania] has adopted the rule, even for civil cases, that a communication between court and jury of which counsel is unaware requires reversal without more. It so held because prejudice is always possible from such communications though the existence of prejudice cannot be demonstrated, and because experience had shown the need for firm

guidelines for trial judges in this sensitive area of judge-jury relations.

There are federal cases that seem to hold that a defendant denied his right to be present at every stage of the proceeding need make no showing of prejudice to obtain reversal. Implicitly this is the teaching of the Sheilds case itself, because there the contents of the notes were known and the instruction conveyed by the note from the judge was assigned as error, but the Court ignored that ground and, without any discussion of possible prejudice, reversed on the bare ground that the notes had been exchanged in the absence of the defendant. There are several clear holdings in the lower courts that a showing of prejudice is not required. (Footnotes omitted.) (Citations omitted.)

The Wright treatise goes on to recognize that some courts have, to the contrary, required that the defendant show that what occurred was prejudicial. The Wright treatise states:

The usual rule is that an error concerning the defendant's presence at all stages of the trial is harmless if it can be said that there was no reasonable possibility of prejudice from the error, and this is the standard most courts have applied on the consequences of communications between court and jury. As the Supreme Court said long ago, such communications "invalidate the verdict, at least until their harmlessness is made to appear." If the communication is a part of the record, and its substance is proper, then it can be said affirmatively that the error was harmless. But if it is impossible to be sure exactly what was said to the jury, either because the message was delivered orally through a third person or for some other reason the communication is not a part of the record, reversal must follow. There must be reversal, also, if the content of the communication is known but it was in some way substantively improper and it cannot be told whether this influenced the jury. (Footnotes omitted.) (Citations omitted.)

■ This Court has not definitively held that every communication by the court or court officer with the jury outside the presence of the defendant is prejudicial error.

Rather, it has adopted a position consistent with the courts referred to in the Wright treatise, which hold that the absence of the defendant is deemed to be prejudicial error unless the State can prove rather conclusively that the absence was harmless. In fact, that is the full holding of syllabus point 6 of *State v. Boyd, supra,* which states, in its totality:

The defendant has a right under Article III, Section 14 of the *West Virginia Constitution* to be present at all critical stages in the criminal proceeding; and when he is not, the State is required to prove beyond a reasonable doubt that what transpired in his absence was harmless.

■ In the case presently before the Court, the conversation between the court clerk and the jurors was not recorded, and neither the defendant nor his attorney was present. The Court cannot determine from the record precisely what was said. It does appear to this Court from the record available that the clerk in some way informed the jurors as to the weight or meaning they should attach to certain matters which they heard in court. The record also falls short of demonstrating beyond a reasonable doubt that what transpired in the defendant's absence was harmless, and, under the circumstances and the rule set forth in syllabus point 6 of *State v. Boyd,* the Court believes that the defendant's conviction must be reversed and that he must be afforded a new trial.

The assignment of error on this issue raises another point, which the Court believes appropriate for consideration. The point is that it is suggested that the defendant, by failing to object either in person or through his counsel, waived his right to challenge the communication in his absence.

Although this Court has suggested that a defendant, under certain circumstances, may waive his right to be present at all critical stages of a criminal proceeding by voluntarily absenting himself from that proceeding, the Court has recognized such a waiver only in non-capital cases. *See State v. Layton,* 189 W.Va. 470, 432 S.E.2d 740 (1993), and *State v. Tiller,* 168 W.Va. 522, 285 S.E.2d 371

(1981). This is consistent with federal law. *See* Rule 43 of the Federal Rules of Criminal Procedure and C.A. Wright, Federal Practice and Procedure Criminal 2d § 723. There remains some question under federal law as to whether such a waiver may occur in a capital case. *See* C.A. Wright, Federal Practice and Procedure Criminal 2d § 723.[2]

Apart from the fact that the present case is potentially a capital case and there is a question of whether waiver can ever occur in such a case, we note that where we have recognized waiver we have indicated that such waiver must be knowingly and intelligently made and the fact that it was so made must be conclusively demonstrated on the record. *See State v. Layton, supra; State v. Hamilton,* 184 W.Va. 722, 403 S.E.2d 739 (1991); and *State ex rel. Grob v. Blair,* 158 W.Va. 647, 214 S.E.2d 330 (1975).

Further, in *State v. Hamilton, supra,* while the Court recognized that a defendant's right to presence may be waived (in a noncapital case), the Court indicated that the right to be present could not be waived by his attorney, but had to be accomplished by the defendant himself. The Court said:

> "Waiver of a defendant's fundamental and constitutional right to be present at every stage of the proceedings against him may be accomplished. It must be achieved, however, by the defendant himself in the form of a knowing and intelligent waiver."

*State v. Hamilton, supra* at 726, 403 S.E.2d at 743.

■ After reviewing the record in the present case, the Court can find nothing to suggest that the defendant knew what was said during the communication between the court clerk with the jury or the potential implication of his absence. Further, there is no showing that he in any way intelligently waived his right to such presence. Under such circumstances, the Court cannot find a

waiver, even if it were appropriate, in a case such as the one at hand.

This Court does believe that the circuit court was somewhat misled by defense counsel's failure to object or otherwise suggest that defendant's absence presented a problem. The right to presence, however, is so fundamentally important that the Court does not believe that that right should be compromised by what had occurred. Clearly, the first contact when the jurors revealed that they had heard the remarks was unavoidably outside the control of the court. This Court believes that the real problem arose when the trial judge sent the court clerk to speak to the jurors, in the absence of the defendant, of the attorneys, and the judge herself. The judge previously indicated that she would personally speak with the jurors, but instead she sent the clerk. When confusion arose as to what was said between the clerk and the jurors, the Court believes that, to salvage the trial, it was incumbent upon the trial judge to conduct a hearing at which a record was made to demonstrate that what was said between the clerk and the jurors was harmless.

The defendant also makes a number of assignments of relating to the trial judge's contacts with the jury and discussion with them about their sequestration on the night of May 25, 1995.

At around 9:15 p.m. on May 25, 1995, the trial judge received a note from the jury in the present case, which was then deliberating on the defendant's verdict, stating: "We need to break for the night." The trial judge informed both the defendant's attorney and the State that because it was so late she could not sequester the jury. She also indicated that she intended to let the jury members go home and that she intended to instruct them: "Make sure you don't listen to the news tonight, don't read the paper in the morning, don't talk to any family members." At this time, the defendant was not present.

---

**2.** In a note involving amendments to Rule 43, in 1975, the Advisory Committee stated:

> The defendant's right to be present during the trial on a capital offense has been said to be so fundamental that it may not be waived. *Diaz v. United States,* 223 U.S. 442, 455, 32 S.Ct. 250, 253–54, 56 L.Ed. 500 (1912) (dic-

tum); *Near v. Cunningham,* 313 F.2d 929, 931 (4th Cir.1963).

Elsewhere, it has been suggested that it may, under certain circumstances, be waivable. *See* C.A. Wright, Federal Practice and Procedure Criminal 2d § 723, note 3.

Defense counsel objected to the court's not sequestering the jury. Defense counsel, however, did not object to the trial judge contacting the jury or giving the jury the proposed instruction.

Thereupon, the judge entered the jury room with the court reporter, but without the defendant and the defendant's attorney. Once in the jury room, the court informed the jury that if they wanted to go home:

That's fine if you do. Let me make sure—this case has received widespread publicity. Please, please do not watch—we no longer have an alternate. Do not watch the 11:00 o'clock news. Don't listen—I'm trying to think of every possible way you could get information about this case other than what you should base your verdict on.

Don't listen to the radio. I mean, by the time you get back in here in the morning, do not listen to the radio. Do not watch the TV period. Do not read the newspaper. Do not discuss it with anybody. There's been cameras and stuff outside, so if your family and your people say—or wherever you are going say something to you about the case, make sure you explain to them right off the bat, you can't talk about the case, okay?

I really need your absolute commitment to do that.

The court then informed the jury that they should return at 10:00 a.m. in the morning. A juror then asked, "When is the balloon ride?" An unidentified juror then said to the court, "Judge Ranson, can you do something about him?" The judge replied that she could send him off in a balloon. The jury foreman then asked one more question about how to fill out the verdict forms. The court addressed the question and dismissed the jurors.

As with the previous assignment of error, the defendant claims that his right to be present was violated and that the court's action with regard to entering the jury room constituted prejudicial error.

As indicated in syllabus point 6 of *State v. Boyd, supra,* even where a defendant has the right to be present at a critical stage in a criminal proceeding, his absence may be deemed to be harmless error if the State proves beyond a reasonable doubt that what transpired in his absence was harmless.

■ In the present case, it does appear that what transpired when the trial judge entered the jury room after informing the attorneys in the case was recorded by the court reporter. This Court has reviewed what was said and cannot conclude, in light of the transcript, that what occurred was in any way prejudicial to the defendant, even though it did contain some unexplained banter relating to a balloon ride. In essence, the Court believes that the transcript adequately shows that what occurred was harmless.

The defendant makes another assignment of error relating to his absence during critical proceedings during the trial. It appears that before dismissing the jury, the trial judge noted that she "had suggested to the jury that [she] might sequester them". On appeal, the defendant claims that no prior suggestion of sequestration had taken place in open court or in the presence of counsel or the defendant. He also takes the position that there is no official record as to what transpired when the judge suggested sequestration to the jurors. The defendant, on appeal, essentially claims that if such a suggestion had been made by the trial judge to the jury in the absence of the defendant and his attorney and without any record being made, the court's action absolutely violates his right to be present at every critical stage of the proceedings and that the action by the trial court constitutes prejudicial error.

■ The Court believes that this assignment of error is quite similar to the first assignment discussed, that is, the assignment relating to the clerk's *ex parte* communication with the jury. As in that case, the defendant had the right to be present and that the record fails to show beyond a reasonable doubt that no prejudicial action had occurred. As a consequence, the Court believes that what did occur, as with the first assignment of error, constituted prejudicial error. The Court notes that, with regard to this assignment of error, unlike the situation with the first, trial counsel did interpose an objection, although that objection apparently related to the nonsequestration decision rath-

er than the discussion of the decision in the defendant's absence.

On appeal, the defendant also makes a number of assignments of error relating to statements which he characterizes as hearsay statements. In view of the fact that the Court has determined that the judgment must be reversed because of the absence of the defendant during critical phases of the trial, the Court believes that it is unnecessary to discuss these assignments. Certain of the statements did not directly implicate the defendant in the crime. For instance, one statement was that Otilia Lynch had told the police that she had received information from an unidentified source that the police could find bloody clothing and bloody articles relating to the crime involved in this case in a dumpster in the area of New Amandaville Court. A similar statement was that Christine Claytor had received a phone call about clothing being in a dumpster. Even if these statements constituted hearsay, this Court cannot see how they had substantial probative value or how they were in any way prejudicial to the defendant. However, the Court, in view of the reversal on other grounds and the need for a new trial, has not addressed the hearsay question in depth. Such questions, if raised, should be carefully examined on retrial in light of the requirements of the Rules of Evidence and the decision of this Court interpreting those rules.

The defendant next claims that the prosecution prejudiced his due process rights when, in closing, the prosecution told the jury that the defendant would not have it that bad in the State penitentiary because of the amenities provided to inmates.

The specific remarks made during closing argument were:

Ladies and gentlemen of the jury, Terrence's mom hasn't been present in the courtroom. She's in Detroit. When you pass on the issue of mercy, no mercy, remember: Michael D. Hicks is not going to have it that bad. State penitentiary, you have clothing, you have shelter, you have medical assistance, you have libraries, lift weights, shoot basketball, all these things.

His relatives can come visit him any time they want to. And if Terrence's mother has to visit him, she has to go to the grave site. She will never hold her son again. On the other hand, they can visit him.

Defense counsel did not object to these arguments.

■ While this Court believes that the argument was improper and prejudicial, the Court believes that the defense attorney's failure to object precludes this Court's consideration of these remarks on appeal. *See State v. Trogdon*, 168 W.Va. 204, 283 S.E.2d 849 (1981).

The defendant claims that the testimony of the two alleged eyewitnesses, Terri Bannister and Carli Campbell, was contradictory on key points and that, as a consequence, the evidence was insufficient to support a conviction of murder in the first degree.

Recently, in syllabus point 1 of *State v. Guthrie*, 194 W.Va. 657, 461 S.E.2d 163 (1995), this Court stated that:

The function of an appellate court when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, is sufficient to convince a reasonable person of the defendant's guilt beyond a reasonable doubt. Thus, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt.

■ In the present case, the two witnesses whose testimony is claimed to have been conflicting, Terri Bannister and Carli Campbell, both testified that they were eyewitnesses to the murder as it occurred, and both indicated that Michael D. Hicks, the defendant, committed the crime. Although there were some discrepancies in their testimony, the discrepancies involved details. For instance, Carli Campbell, who was testifying as a witness many months after the event which occurred, stated that she arrived at the trailer where the killing occurred at around noon.

Terri Bannister, on the other hand, testified that she arrived at around 9:30 to 10:00 a.m. There was also some dispute as to the exact time when the murder occurred. On another point, Terri Bannister testified that when the defendant, Michael Hicks, was strangling the victim, he asked for another belt because the belt which he was using had broken. Carli Campbell stated that Michael Hicks put a belt around the victim's neck and began to strangle him, but did not mention the belt breaking. On still another point, Carli Campbell testified that when the victim fell to the floor, the defendant, Michael Hicks, started cussing and calling him names and also said that he would never rip anybody off again. Terri Bannister, on the other hand, indicated that Michael Hicks had never said anything like "you'll never rip anybody else off."

In this Court's view, the jury could have properly considered the discrepancies in the evidence and still concluded that Terri Bannister and Carli Campbell were truthful witnesses and that their accounts, indicating that the defendant, Michael D. Hicks, had killed the victim in their presence, were truthful.

After viewing the evidence in the light most favorable to the prosecution, as is required by *State v. Guthrie*, this Court believes that a rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt and that the defendant's claim on this point is without merit.

■ Lastly, the defendant claims that the trial court erred by summarily denying Michael Hicks' request for the return of money confiscated from him upon arrest without a hearing, when such money was not a part of the sentence, was not ill gotten gain, and was not usable or relevant as evidence at trial.

Article III, § 10 of the West Virginia Constitution provides that "[n]o person shall be deprived of life, liberty, or property, without due process of law, and the judgment of his peers." In examining the property question at hand, this Court can find no principle of law which authorizes the State to retain the money in question. From the record available, the Court believes that the defendant,

Michael D. Hicks, is entitled to return of the money in question and that the money should be returned forthwith.

For the reasons stated, the judgment of the Circuit Court of Kanawha County is reversed and this case is remanded for a new trial.

Reversed and remanded.

RECHT, Judge, sitting by temporary assignment.

McHUGH, Chief Justice, filed dissenting opinion in which WORKMAN, Justice, joined.

McHUGH, Chief Justice, dissenting:

It is quite clearly a most basic tenet of our criminal courts system that a defendant is afforded the right to be present at all critical stages of criminal proceedings. *See W. Va. Const.* art. III, § 14. On this fundamental point of law, the majority and I unquestionably agree. We further agree that when a defendant is absent during a critical stage, the State must prove that what transpired during such absence was *harmless.* Syl. pt. 6, *State v. Boyd,* 160 W.Va. 234, 233 S.E.2d 710 (1977). It is the majority's application of this principle to the facts of this case, resulting in the unjustified reversal of defendant's conviction, with which I cannot agree.

As described in the majority opinion, at least two jurors overheard comments by trial spectators which suggested that the anonymous phone calls to police, apparently fingering the defendant in the murder, were not trustworthy. Not surprisingly, defendant's counsel expressed no concern regarding these comments, as they obviously reflected badly on the credibility of the State's evidence and were, more importantly, favorable to the defendant. In contrast, the prosecutor understandably indicated its concern to the court about what possibly transpired between the spectators and the jurors. The court's clerk, at the direction of the trial judge, subsequently spoke with jurors about the comments, out of the presence of the prosecutor, defendant and defendant's counsel. Obviously, the procedure used by the court to determine the nature and substance

of the comments was less than desirable. However, defendant's counsel failed to make any objection to this *ex parte* communication.

Clearly, the trial spectators' comments, if anything, *benefitted* defendant's case, rather than prejudiced it. I therefore believe that defendant's absence during the ensuing conversation between the clerk and jurors on the matter was harmless and, in no way, constituted reversible error. In that I would have affirmed defendant's conviction of first degree murder, I respectfully dissent.

I am authorized to state that Justice WORKMAN joins in this dissenting opinion.