599 S.E.2d 799

**STATE of West Virginia Plaintiff Below, Appellee**

v.

**Housein B. KEATON, Defendant Below, Appellant.**

No. 31575.

Supreme Court of Appeals of West Virginia.

Submitted March 31, 2004.

Decided June 17, 2004.

Concurring Opinion of Justice Davis June 18, 2004.

---

Davis, J., concurred and filed separate opinion.

Darrell V. McGraw, Jr., Attorney General, Robert D. Goldberg, Assistant Attorney General, Charleston, for Appellee.

Jay Craig, Public Defender Corporation, Charleston, for Appellant.

STARCHER, J.:

In April of 2003 the appellant, Housein B. Keaton, was convicted of malicious wounding in the Circuit Court of Kanawha County. He appeals his conviction, asserting that a comment made by the trial judge when speaking with a juror, just before the jury began its deliberations, created such a possibility of unfair prejudice against the appellant by one or more jurors that the appellant's conviction may not stand. We reverse the appellant's conviction and remand the case for a new trial.

I.

*Facts & Background*

The appellant's trial began on a Monday. The trial judge, with the consent of the appellant and the prosecution, did not seat an alternate juror. At *voir dire*, one juror told the judge that the juror had a previously scheduled medical appointment for a surgical tooth extraction on the coming Wednesday at 12:00 noon.

The judge told the juror that the appellant's trial "should be through before then" and it appears that all parties agreed with this assessment. However, on Wednesday morning, it became clear that the presentation of evidence would not conclude until

mid-morning, meaning that the jury instructions and closing arguments would go on beyond noon.

Anticipating such a possible problem, the appellant's counsel had told the trial judge on Tuesday that he, appellant's counsel, would probably agree to the case going to a jury of eleven jurors. On Wednesday morning, however, the appellant, after having been advised by the judge outside of the presence of the jury of his constitutional right to a twelve-person jury, told the judge that he wanted to exercise that right. This decision by the appellant left the trial court with two options. One option was to excuse the jury after the evidence was completed, and have the jury return on Friday—after the juror had sufficiently recovered from the surgery—for instructions, closing arguments, and to begin deliberating. The other option was to see whether the juror could reschedule the surgery.

At this juncture, the judge had a colloquy with the appellant and his counsel. Then the judge had a conversation with the juror at which neither the appellant or his counsel were present. The conversation with the juror took place, according to the transcript, "in the jury room." It is in this conversation with the juror that the judge made the remarks that the appellant assigns as error.[1] The entire exchange between the judge, the appellant's counsel, the appellant, and the juror went as follows:

THE COURT: Okay. Mr. Keaton, you understand you're entitled to a trial of twelve impartial jurors, and a verdict of guilt must be unanimous. And you have to have twelve people finding you guilty before you can be found guilty. And the proof, the degree of proof is, of course, beyond a reasonable doubt. You have the constitutional right to demand that. In the event, as we only have eleven jurors, you may waive that constitutional right and agree to have eleven jurors deliberate and arrive at a verdict. But the Court can't force you to do that. And your lawyer can't force you, and the State can't force you. That is in your hands.

And I would ask you, have you discussed this with your lawyer?

THE DEFENDANT: Yes.

THE COURT: And what, what can we do, if, for example, you do not agree, what we will do is continue the trial of this case for a day or two or three so that we can have the entire jury here, so they can hear the arguments.

MR. DICKINSON: That's what he'd rather do. Your Honor. That's what he rather do.

THE COURT: Pardon me?

MR. DICKINSON [defense counsel]: That's what he would rather do.

THE COURT: What's that?

MR. DICKINSON: Wait until Friday morning.

THE COURT: *You talk to him. Let me ask you—all this, do you have any objection if I were to make an inquiry of that juror with the court reporter and bailiff present, as to what, whether or not she can postpone her surgery for a day or -*

MR. DICKINSON: *No, no, I don't have any objection.*

THE COURT: *Do you have any objection, Mr. Keaton?*

MR. KEATON: *I don't understand.*

THE COURT: *Pardon me.*

*WHEREUPON, counsel for the Defendant, Mr. Dickinson and the Defendant have an off-the-record conference.*

---

1. The record is silent as to whether this was a private conversation, or whether it took place in the presence of any other jurors. This Court was advised at oral argument that not even the court reporter recalls one way or another. The appellant plausibly argues that the other jurors were in the jury room and likely overheard the conversation—because immediately before the conversation, the record shows that the jurors were not in the main courtroom where the judge was discussing the matter with counsel. Whether the conversation was private or not, the juror with whom the judge had the conversation might have told one or more other jurors of the substance of the conversation. Given the state of the record, we will assume *arguendo* that there is a reasonable chance that one or more other jurors either heard or learned the substance of the judge's conversation with the juror who had the medical appointment.

MR. DICKINSON: *No. We have no objection to doing that.*

THE COURT: All right. Will the court reporter and the bailiff join me in the jury room?

WHEREUPON, The Court, court reporter and bailiff adjourned to the jury room, after which the following proceedings were had in the jury room:

THE COURT: *Ms. * * *, we thought we would be through yesterday, we're not. And the Defendant is entitled to a 12–man jury. And we had anticipated that if something like this came up they would go along with eleven. But I think the Defendant is pressing, you know, he wants a 12–man jury. Now, we can do one of several things: I can continue the trial of this case until, say, Friday. Give you time to recover from any surgery you have and come on in Friday morning and have you hear my instructions and argument of counsel and you-all deliberate. Or you can—we can come in tomorrow if you think you're up to it tomorrow. Or you can check with your doctor and see if he can do the surgery tomorrow rather than today.*

*I don't know how painful that is.*

JUROR: *See, I don't know if they will be able to schedule because it was, like,—I mean, it's been a while. You know, what I'm saying?*

THE COURT: *Uh-huh. Well, first, let me ask you this, is the pain so unbearable that you cannot postpone?*

JUROR: *No, I can postpone it.*

THE COURT: Would you, you can use this phone or go outside and talk to his secretary or whoever does his scheduling and tell her what the problem is and see if you can reschedule it.

JUROR: Okay. Let me see what they say.

THE COURT: Do you want privacy, here, on your phone call? Do you want us to leave?

JUROR: It doesn't matter. I can call. I have to give a call to the person who drove me down here because I'm unable to drive home after sedation. So I have to get a hold of them, also.

THE COURT: Okay.

JUROR: So, it will be all right.

WHEREUPON, this concludes the on-the-record conference held in the jury room.

(Emphasis added.)

The juror then called the juror's doctor and was able to postpone the appointment. Thereafter, the jury deliberated, and the appellant was convicted.

The appellant's counsel learned of the exact words of the conversation that the judge had with the juror two months after the trial ended, when the appellant's counsel was reviewing the trial transcript to prepare an appeal of the appellant's conviction. The appellant's counsel did not make any motions to the trial court after learning of the substance of the conversation—instead raising the issue of the conversation for the first time on appeal.

II.

*Standard of Review*

█ There was no post-trial objection or motion made before the trial court regarding the judge's remarks, so our review is *de novo*, to determine if "plain error" occurred. Syllabus Point 4 of *State v. England*, 180 W.Va. 342, 376 S.E.2d 548 (1988), states, in pertinent part:

The plain error doctrine ... enables this Court to take notice of error, including instructional error occurring during the proceedings, *even though such error was not brought to the attention of the trial court.* However, the doctrine is to be used sparingly and only in those circumstances *where substantial rights are affected,* or the truth-finding process is substantially impaired, or a miscarriage of justice would otherwise result.

(Emphasis added.) As we discuss in Part III. *infra*, we also apply to the alleged error the standard of "harmless beyond a reasonable doubt."

## III.

### Discussion

■ The appellant first argues that he did not personally agree to the trial judge speaking with the juror outside of the defendant's presence—and that therefore the judge's *ex parte* contact with the juror was in itself erroneous.

This Court has stated that "[w]aiver of a defendant's fundamental and constitutional right to be present at every stage of the proceeding may be accomplished[, but i]t must be achieved ... *by the defendant himself* in the form of a knowing and intelligent waiver." *State v. Hicks,* 198 W.Va. 656, 663, 482 S.E.2d 641, 648 (1996) (emphasis added).

The record shows that the appellant's counsel, after speaking with the appellant about the judge's suggestion, immediately said to the judge, "*We* have no objection to doing that." (Emphasis added.) Was this a waiver "by the [appellant] himself"? *Id.* We conclude that it was.

It would have been better, perhaps, for the trial court to have asked for an "out-loud" statement by the appellant, instead of relying on the appellant's counsel's statement. But the context in which the appellant's counsel's statement to the judge occurred demonstrates to our satisfaction that the appellant consulted with his counsel, and then allowed his counsel to state that the appellant personally agreed to the trial judge speaking with the juror without the appellant being present.[2]

The appellant's argument that the judge's *ex parte* conversation with the juror was itself erroneous is therefore not persuasive.

■ The appellant next argues that the circuit court's remarks in the conversation were, categorically, either *per se* or presumptively unfairly prejudicial to the appellant— simply because they were comments about the appellant's exercise of a constitutional right. The appellant also argues that without applying any categorical presumption,

the judge's remarks nevertheless created a real possibility of unfair prejudice by the jury against the appellant, that denied him a constitutionally fair trial.

In this regard, the appellant argues that the judge's remarks may have led members of the jury to

> ... draw[ ] the following negative inferences from the trial court's comments: (1) Keaton was an obstructionist who would resort to sacrifice the health of a juror for the sake of tactical advantage; (2) Keaton lacked sufficient confidence in his defense to submit his case to a jury of eleven members; (3) it was entirely up to Keaton as to whether [the juror] would be relieved from jury duty; and (4) Keaton was completely insensitive to [the juror]'s pain.

(Appellant's brief, emphasis in original.)

The appellant further argues:

> Mr. Keaton does not contend that the trial court acted with actual malice towards him, and acknowledges that the court was faced with an administrative difficulty. Nevertheless, he cannot be reasonably expected to give up his right to a fair trial to accommodate the scheduling demands of the court or the needs of a juror who has been sworn to serve. Clearly, the trial court erred in even *commenting* on the proper exercise of Mr. Keaton's rights, particularly when negative inferences could be drawn from these comments.

*Id.* (Emphasis in original.)

It would probably go too far—and it is unnecessary in the instant case—to rely upon the appellant's argument that *all* comments in front of the jury about a criminal defendant's exercise of a constitutional right should be *per se* or presumptively erroneous. However, in fact comments before the jury about a criminal defendant's exercise of his or her constitutional rights are very commonly found to be erroneous.

For example, this Court has found error on many occasions in comments regarding a defendant's assertion of the constitutional

---

**2.** This Court has stated that a "trial judge acts at his or her peril when he or she conducts *ex parte* communications with a deliberating jury[.]" *State v. Crabtree,* 198 W.Va. 620, 630 n. 10, 482 S.E.2d 605, 615 n. 10 (1996). As the instant case shows, this peril exists even when the appellant has waived his or her right to be present.

right to remain silent. *See, e.g., State v. Mills,* 211 W.Va. 532, 566 S.E.2d 891 (2002); *State v. Walker,* 207 W.Va. 415, 533 S.E.2d 48 (2000); *State v. Green,* 163 W.Va. 681, 260 S.E.2d 257 (1979); *State v. Boyd,* 160 W.Va. 234, 233 S.E.2d 710 (1977).[3]

While our research has not identified any West Virginia cases on point, other jurisdictions that have looked at the issue of comments in front of a jury about a criminal defendant's exercise of the right to a jury trial have ordinarily found the comments to be erroneous—although not always rising to the level of reversible error.[4]

In *People v. Rodgers,* 756 P.2d 980 (Colo. 1988) *(en banc), reversing People v. Rodgers,* 734 P.2d 145 (Colo.Ct.App.1986), a majority of the court held that a prosecutor's comment on the defendant's exercise of his right to a jury was error, but also that the evidence of the defendant's guilt was so overwhelming as to make the error harmless beyond a reasonable doubt. Three justices dissented in *Rodgers,* holding that the prosecutor's comments on the defendant's exercise of his right to a jury trial required reversal "without regard to the strength of the state's case against the defendant." 756 P.2d at 986. *See also Villarreal v. State,* 860 S.W.2d 647 (Tx.Ct.App.–Waco 1993); *Cunningham v. Zant,* 928 F.2d 1006, 1019 (11th Cir.1991) (prosecutor erred in saying he was "offended" by defendant's exercise of right to jury trial); *State v. Thompson,* 118 N.C.App. 33, 41, 454 S.E.2d 271, 276 (1995) ("the exercise of the right to a jury trial is ... no less fundamental in our jurisprudence than reli-

ance upon the right to remain silent[;]") *People v. Herrero,* 324 Ill.App.3d 876, 888, 756 N.E.2d 234, 245, 258 Ill.Dec. 252, 263 (2001) ("For [the prosecutor] to have commented on [the defendant's] decision to exercise his constitutional right to a jury is outrageous, casting a shadow over the proceedings that simply cannot be ignored.")[5]

Having the foregoing principles in mind, we turn to the remarks at issue in the instant case. These remarks amounted to the trial judge telling the juror that because the appellant was "pressing" his constitutional right to a twelve-person jury, the juror could not be excused from the case to attend the scheduled appointment. The consequence of the appellant's exercise of his right was, at the least, a significant inconvenience to either the juror or the entire jury. And the jury learned that the appellant was the cause of the inconvenience from the trial judge.

▮ Initially, it should be observed that the comments at issue came from a court officer—the trial judge—who is recognized as having perhaps the greatest potential for influencing the jury. On this point, Syllabus Point 4 of *State v. Wotring,* 167 W.Va. 104, 279 S.E.2d 182 (1981) states in pertinent part:

The trial judge in a criminal trial must consistently be aware that he [sic] occupies a unique position in the minds of the jurors and is capable, because of his [sic] position, of unduly influencing jurors in the discharge of their duty ...[6]

*See Gomez v. State,* 572 So.2d 952 (Fla.App. 5 Dist.1990).

---

**3.** This Court has also recognized the importance of scrupulously respecting a criminal defendant's exercise of the constitutional right to a jury trial. *See Scott v. McGhee,* 174 W.Va. 296, 298, 324 S.E.2d 710, 713 (1984) (municipal court cannot penalize exercise of constitutional right to a jury trial). *See State v. Swafford,* 206 W.Va. 390, 398, 524 S.E.2d 906, 914 (1999), where Starcher, J., concurring, stated:

The privilege of addressing the jury [afforded to a prosecutor] should never be taken as a license to ... comment upon ... issues such as race, religion, economic status, *[or] the accused's exercise of a constitutional right* .... (Emphasis added.)

**4.** Comments on a defendant's exercise of the constitutional right to refuse to consent to a search have also been found to be erroneous.

**5.** The special concurrence in *Herrero* by Presiding Justice Quinn is a thoughtful discussion of the issue of "harmless error" in connection with comments on the exercise of constitutional rights by a criminal defendant.

**6.** *Compare State v. Hicks,* 198 W.Va. 656, 482 S.E.2d 641 (1996), where a court clerk's apparent remarks about an evidentiary standard led to a conviction's reversal. As our discussion illustrates, the case law in the area of commenting on a defendant's exercise of constitutional rights— like the right to remain silent, the right to have counsel, and the right to a jury trial—arises primarily from situations where the comments in question are made by a prosecutor, often in

While there is no reason to believe that the judge's comment was motivated by anything other than the judge's wish to fully explain the circumstances to the juror, common sense tells us that the judge's inadvertent but unnecessary remarks could have caused a substantial negative feeling toward the appellant by one or more jurors.

As the appellant's brief, quoted *supra*, suggests, the judge's remarks might well have caused one or more jurors to feel annoyed or angry at the appellant for inconveniencing the juror who had surgery scheduled—or for being willing to cause the jury's deliberation to be delayed by two days.

Such juror annoyance or anger at a criminal defendant (about an entirely irrelevant matter) has the inherent potential to improperly affect jury deliberations—by making it harder for jurors to view and weigh the evidence impartially, and to scrupulously afford the defendant the benefit of such difficult-to-apply principles as the presumption of innocence and the prosecution's burden of proof beyond a reasonable doubt.[7]

In *People v. Rodgers, supra*, the majority held that erroneous comments before the jury about a criminal defendant's right to a jury trial require reversal of a conviction unless it is shown that the error was "harmless beyond a reasonable doubt"—a standard that this Court applies to many trial errors of a constitutional dimension. 756 P.2d at 985. *See* Syllabus Point 5, *State v. Flippo*, 212 W.Va. 560, 575 S.E.2d 170 (2002); Syllabus

Point 5, *State v. Blair*, 158 W.Va. 647, 214 S.E.2d 330 (1975).[8]

Under this standard, if the evidence of a defendant's guilt is so overwhelmingly one-sided that this Court can say that there is absolutely no reasonable possibility that any prejudice flowing from the error could have made a difference in the jury's verdict, then this Court *may* find the error to be harmless beyond a reasonable doubt. The burden to make such a showing is upon the prosecution. *Flippo* and *Blair, supra*.

Because the alleged error in the instant case arose from the appellant's exercise of his constitutional right to a twelve-person jury, we agree with the *Rodgers* majority that it is logical to apply the "harmless beyond a reasonable doubt" standard. We also conclude that the serious potential for prejudice flowing from the remarks in question meets the "affecting substantial rights" test for plain error set forth in Syllabus Point 4 of *State v. England*, 180 W.Va. 342, 376 S.E.2d 548 (1988), *supra*.[9]

We have looked closely at the totality of the evidence presented at the appellant's trial. Our review shows that the evidence tending to show the appellant's guilt was substantially controverted—by both the appellant taking the stand and telling his "self-defense" version of events, and by eyewitness testimony corroborating the appellant's version of events. While there was sufficient evidence tending to show the appellant's guilt upon which the jury could properly convict the appellant, it cannot be said that the evidence

cross-examination, opening statement, or closing argument. In a case like the instant one, where the comment in question comes from the trial judge, the cautionary lessons of the case law are intensified. This is because prosecutors are ordinarily expected to have a "bias" against the defendant; and prosecutor's remarks are viewed, to a certain degree, in light of that expectation. A trial judge, however, is a neutral party at a trial, and is expected to studiously and zealously avoid any unnecessary conduct or remarks that might be construed by the jury as reflecting adversely upon a criminal defendant.

7. This is the same sort of animosity-based potentially prejudicial effect that leads

[a]ppellate courts [to] give strict scrutiny to cases involving the alleged wrongful injection of race, gender, or religion in criminal cases.

Where these issues are wrongfully injected, reversal is usually the result.
Syllabus Point 9, *State v. Guthrie*, 194 W.Va. 657, 461 S.E.2d 163 (1995).

8. We note that some errors require *per se* reversal of a conviction without any further consideration of the error's possible effect on the trial process. *See, e.g., State v. Haddox*, 166 W.Va. 630, 276 S.E.2d 788, (W.Va.1981) (giving an instruction in a criminal case that supplies by presumption any material element of the crime charged is reversible error).

9. For a thoughtful and still quite vital discussion of the issue of harmless error, *see State v. Atkins*, 163 W.Va. 502, 261 S.E.2d 55 (1979) (both the majority opinion and the dissent by Justice Harshbarger).

against the appellant was so overwhelming as to meet the harmless-beyond-a-reasonable-doubt standard. For this reason, the appellant's conviction must be reversed and the instant case remanded for retrial.

■ Additionally, based upon the foregoing discussion, to give trial judges guidance in the future, we hold that the best practices to be followed when a trial judge addresses or converses with a juror or the jury in a criminal proceeding are as follows, unless special circumstances—that should be fully spread upon the record—dictate otherwise: (1) the judge should address or converse with jurors on the record and in the presence of the defendant and his or her counsel unless the defendant personally and affirmatively waives the right to be present; (2) when a trial judge addresses or converses with one or more jurors and the defendant and his or her counsel are not present, the defendant and his or her counsel should be furnished with a prompt oral summary by the trial court and a subsequent transcript of the address or conversation; (3) after the substance or transcript of the address or conversation are made known to the defendant and his or her counsel, any alleged error in or problem with the address or conversation should be promptly presented to the trial court in an appropriate motion—although failure to do so does not *per se* preclude raising any alleged error or problem in the address or conversation on appeal.

## IV.

### Conclusion

For the foregoing reasons, we reverse the appellant's conviction and remand the case for further proceedings consistent with this opinion.

Reversed and Remanded.

Justice DAVIS concurs and files a concurring opinion.

DAVIS, J., concurring:

In this criminal proceeding the majority opinion reversed the defendant's conviction for malicious wounding. I concur in this result. I have chosen to write separately to

underscore the factual basis for my belief that the ex parte remarks made by the trial judge were not harmless beyond a reasonable doubt. Additionally, I believe the defendant presented a strong case of self-defense.

### Self–Defense

The record supports the majority's conclusion that the error in this case was not harmless beyond a reasonable doubt. I will demonstrate the correctness of this conclusion by presenting the trial testimony of eyewitnesses in two contexts: an initial upstairs confrontation between the defendant and the alleged victim, and the downstairs confrontation, which led to the charges against the defendant.

1. **Upstairs confrontation.** No charges against the defendant arose from the initial upstairs confrontation. Nevertheless, details of this confrontation are critical to understanding the circumstances surrounding the subsequent downstairs confrontation, from which the malicious wounding charges arose.

There were two witnesses, excluding the defendant and the alleged victim, to the initial conduct that ultimately led to the stabbing of the alleged victim, Nick Patton. Those two witnesses were Danielle Digiorgi and Stephanie Mullins. The testimony of both of these women was consistent. They both indicated that the initial confrontation between the defendant and Nick occurred on the second floor of the home. Ms. Digiorgi and Ms. Mullins both testified that Nick began taking an illegal drug called crystal methamphetamine before they went upstairs, and continued taking the illicit drug while they were all upstairs. Each woman confirmed that no one else took drugs. The two witnesses also testified that the defendant and Ms. Digiorgi were "horse playing" on a bed. During the "horse play" between the defendant and Ms. Digiorgi, Ms. Digiorgi stated several times to the defendant to "get away from me, get away from me." As a result of his drug-induced state of mind, Nick misunderstood what was occurring and immediately began to attack the defendant. Nick actually chased the defendant downstairs with a knife. The eyewitness trial testimony of Ms. Digiorgi was as follows:

QUESTION: And where was, was [the defendant] standing or sitting, or lying on top of you, or?

MS. DIGIORGI: No. He was, actually, gradually, you know we were just—he was standing some way, and we were just horse playing around. You know how normal kids horse play around. They'll push each other back and forth, and just little things, nothing hurtful, nothing huge.

. . . .

QUESTION: Then what happened?

MS. DIGIORGI: Nick had,—I was playing around. I was, like, "No, get away from me, get away from me." But we had been playing like this all day long; we had been horse playing. And everybody had witnessed us horse playing. And [the victim], all of a sudden, was "Get off of her, leave her alone." And I told Nick no, it was okay that we were just playing. "Don't Nick," we were, we were just playing around. And Nick didn't like it.

So Nick proceeded to push [the defendant] away, push him off. And [the defendant] stepped back, you know. He looked, kind of, shocked, in a way, you know, he had pushed him, you know. There was no, really, reason, at all, to push him. And then Nick proceeded to push him again, and he did and continued to attack him. And that's when [the defendant] stepped back and started to retaliate to what Nick was doing.

QUESTION: How did he retaliate at that time?

MS. DIGIORGI: He had, he got, well one thing—.

QUESTION: What was it? Was it an instrument or was it a fist or—.

MS. DIGIORGI: No, it was with his fist. It was with his hands.

. . . .

QUESTION: And then what happened?

MS. DIGIORGI: Nick pulled out a knife, and [the defendant] ran downstairs.

QUESTION: Who pulled out a knife?

MS. DIGIORGI: Nick did.

. . . .

QUESTION: What did Nick do?

MS. DIGIORGI: He ran after him.

. . . .

QUESTION: So, [the defendant] ran out. And Nick, it wasn't more than a second later, that he ran behind him?

MS. DIGIORGI: Right.

QUESTION: With the knife in his hand?

MS. DIGIORGI: Yes.

Similarly, Ms. Mullins gave the following eyewitness account of what transpired upstairs between the defendant and Nick:

QUESTION: What was Danielle and [the defendant] doing?

MS. MULLINS: They were on the bed, playing around.

. . . .

QUESTION: What were you doing?

MS. MULLINS: I was sitting in the chair that's across from the bed.

QUESTION: Tell us then what happened?

MS. MULLINS: I noticed Nick thought that Danielle didn't want [the defendant] messing with her, so he pushed him off of her.

. . . .

QUESTION: What did [the defendant] do immediately?

MS. MULLINS: He stood up.

. . . .

QUESTION: And what did Nick do then?

MS. MULLINS: He pushed him again.

. . . .

QUESTION: Then what happened?

MS. MULLINS: They began to fight. They both were fighting each other.

. . . .

QUESTION: Then what happened?

MS. MULLINS: Nick pulled out a knife, and [the defendant] went towards the door and went out the door. And when he done that, Nick followed him.

. . . .

QUESTION: Okay. What did he do?

MS. MULLINS: He pulled out the knife, and [the defendant] went out the door. As soon as he went out the door, Nick, I guess, pursued him down to, down the stairs.

QUESTION: Where was the knife when Nick pursued him down the stairs?

MS. MULLINS: In his hand.

QUESTION: In Nick's hand.

MS. MULLINS: Yes.

The testimony of the two eyewitnesses to the upstairs confrontation, Ms. Digiorgi and Ms. Mullins, plainly reveals that the defendant was attacked by Nick because, while under the influence of drugs, Nick misunderstood the horseplay between Ms. Digiorgi and the defendant. When Nick pulled out a knife, the defendant fled. With the defendant retreating, Nick followed him downstairs with the knife in hand. Clearly, Nick initiated the confrontation.

2. **Downstairs confrontation.** When the defendant ran downstairs, he went into the kitchen and retrieved two knives. There were four witnesses, excluding the defendant and the alleged victim, to the stabbing of Nick that occurred downstairs.[1] Those witnesses were Ezra Mullins, Matthew Mullins, Ms. Digiorgi, and Ms. Mullins. With the exception of Ezra Mullins,[2] all the witnesses testified that Nick was trying to stab the defendant when the defendant stabbed Nick. The testimony of Matthew on this issue was as follows:

QUESTION: Did you see Nick with anything in his hand?

MATTHEW: Yeah. He had a knife in his hand, too.

. . . .

QUESTION: Did you see if Nick was trying to stab [the defendant]?

MATTHEW: Yeah. Because I seen him there trying to reach around my dad [Ezra Mullins], too.

QUESTION: So, when you saw your dad breaking them apart, you saw [the defendant] and Nick both trying to stab each other?

MATTHEW: Uh-huh.

Likewise, Ms. Digiorgi gave the following account of what occurred downstairs:

QUESTION: Did you see any part of the fight? Did you get down soon enough?

. . . .

MS. DIGIORGI: Yeah. They were both stabbed. The only time I saw any stabbing was [the defendant] when he went to block his face from Nick, and Nick had got him on the arm.

QUESTION: Is that the first stabbing or the first slice of the knife that happened?

MS. DIGIORGI: I don't know. That is the only one I saw.

Additionally, Ms. Mullins gave the following account of the stabbing incident:

QUESTION: What did you see?

MS. MULLINS: When I came down, there was, Nick was, I guess, going towards [the defendant]. And he had his arm up, blocking, I guess, him stabbing him.

QUESTION: He had his arm up, who had his arm up?

MS. MULLINS: [The defendant] had his arm up, blocking.

. . . .

QUESTION: Did you see any injuries on [the defendant]?

MS. MULLINS: Yes. On his arm.

Based on the above quoted testimony of what actually took place upstairs and what occurred downstairs, it is clear that the eyewitness testimony was *in favor* of the defendant, as to both the initial confrontation and the ultimate wounding of the alleged victim.[3] In other words, this was not a "slamdunk" case for the State. The jury could very easily have found that the defendant was acting in self-defense when Nick was stabbed.

The defendant argues that the jury ruled against him because the trial judge cast him in an improper light during an ex parte communication with one of the jurors. Be-

1. There was also a seventh person in the home, Shawn Mullins. However, Shawn's testimony indicated that he was sleeping and could only recall events that occurred after the stabbings had taken place.

2. Ezra Mullins testified that the events happened too quickly and that he did not remember if Nick had a knife.

3. In fact, the only eyewitness testimony that was not favorable to the defendant involved his post-stabbing conduct. That is, after the altercation ended, the defendant panicked and acted irrationally. For example, the defendant pulled the telephone off of the wall and grabbed a person to help him escape from the scene. Importantly, though, the defendant was not on trial for his post-stabbing conduct. In fact, this evidence

cause the evidence was so overwhelmingly supportive of the defendant's claim that his actions were done in self-defense, it is obvious that the jury's decision was guided by something other than the evidence. Accordingly, it cannot be conclusively stated that the trial judge's comment did not "detrimentally affect[ ] the substantial rights of the [defendant] and was [not] likely to have [a] serious[ ] affect[ on] the fairness, integrity, and public reputation of the judicial proceedings." *Honaker v. Mahon,* 210 W.Va. 53, 60, 552 S.E.2d 788, 795 (2001). "To hold otherwise would make a mockery of the [right to a fair trial] and trample upon the very essence of due process." *State v. Myers,* 204 W.Va. 449, 464, 513 S.E.2d 676, 691 (1998). Consequently, I believe the majority was correct in reversing the judgment and remanding this case for a new trial.[4]

In view of the foregoing, I respectfully concur.

probably should have been excluded because it had no bearing on the actual malicious wounding charge brought against the defendant.

**4.** Had the defendant alleged in his appeal that the State failed to prove he did not act in self-defense, I would have agreed and taken the position that the case should be reversed, and the State prohibited from re-prosecuting the defendant.